Felix MERCED and Modesta Merced, Plaintiffs-Appellants,

v.

AUTO PAK CO., INC., Defendant-Appellee,

S & C Liquidating Corp. et al., Defendants.

AUTO PAK CO., INC., Third Party Plaintiff,

v.

SOUTHBRIDGE TOWERS, INC., Third-Party Defendant.

No. 185, Docket 75–7273.

United States Court of Appeals, Second Circuit.

Argued Dec. 10, 1975.

Decided April 2, 1976.

Richard E. Shandell, New York City (Katz, Shandell, Katz & Erasmus and Marie M. Lambert, New York City, of counsel), for plaintiffs-appellants.

Richard J. Burke, New York City (Morris, Duffey, Ivone & Jensen, New York City, of counsel), for defendant-appellee.

Morris Zweibel, Mineola, N. Y. (Benjamin E. Gelerman and Crowe, McCoy, Agoglia & Zweibel, Mineola, N. Y., of counsel), for third-party defendant.

Before OAKES, VAN GRAAFEILAND and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

This appeal is in a diversity suit for personal injuries and loss of consortium[1] resulting from an accident which occurred on July 13, 1972, to Felix Merced, an apartment house porter, while working at a trash compactor manufactured by the appellee, Auto Pak Co., Inc. (Auto Pak). The United States District Court for the Southern District of New York, Harold R. Tyler, Jr., *Judge*, set aside a verdict for the appellant Felix Merced on the issue of liability only. A special jury verdict[2] had found that appellant was *not* contributorily negligent, that the machine *was* negligently designed or manufactured as well as defective and unfit to be used for its intended purpose, and that the defect proximately caused the accident which resulted in the loss of appellant's hand and part of his forearm. The court held, however, that as a matter of law there was no liability.[3] We reverse and reinstate the jury verdict.

In 1970, appellant's employer, Southbridge Towers, Inc., third-party defendant here, purchased and installed a number of trash compactors from appellee Auto Pak, including the one which injured appellant. That compactor, or "Gobbler," as it is somewhat ironically called, was located in the basement of a Southbridge apartment building, directly beneath a vertical trash chute. When trash is thrown down the chute it falls by gravity onto an angled deflection plate inside a hopper. The hop-

---

1. While both Felix and Modesta Merced are plaintiff-appellants, Modesta Merced's appeal for reinstatement of her claim for damages is considered only briefly at the end of this opinion. Consequently we refer throughout to Felix Merced as appellant.

2.
### NEGLIGENCE THEORY.

1. Was plaintiff negligent on July 13, 1972, in the operation of the machine?

<u>No.</u>
(Yes or No)

2. If your answer to "1" is "yes", did such negligence proximately cause plaintiff's injury?

‾‾‾
(Yes or No)

3. Was the Gobbler #16 machine in Building No. 7 negligently designed or manufactured?

<u>Yes.</u>
(Yes or No)

4. If your answer to "3" is "yes", describe briefly the negligent manufacture and/or design which you determine.

A mechanical device to avoid "bridging" was not incorporated in the design; therefore, machine could not function as "automatic" but required frequent manual assistance. Also, no protection was afforded from objects ricocheting from deflection plate when hopper door was open.

5. If your answer to "3" is "yes", did such negligence proximately cause plaintiff's accident?

<u>Yes.</u>
(Yes or No)

### BREACH OF IMPLIED WARRANTY THEORY.

1. On July 13, 1972, did plaintiff operate the machine in an unreasonable or unsafe manner?

<u>No.</u>
(Yes or No)

2. If your answer to "1" is "yes", did such operation on plaintiff's part proximately cause his accident?

‾‾‾
(Yes or No)

3. When Auto Pak put the machine in question on the market, was it defective and unfit to be used for its intended purpose?

<u>Yes.</u>
(Yes or No)

4. If your answer to "3" is "yes", describe briefly in what respect you so find.

Please *see attached sheet to Negligence Theory* and furthermore, the machine should have been provided with additional safeguards such as an interlock on the Hopper door.

5. If your answer to "3" is "yes", did such condition proximately cause plaintiff's accident?

<u>Yes.</u>
(Yes or No)

3. Appellee Auto Pak asserted a third party claim against Southbridge Towers, Inc., Merced's employer. The court found, per agreement by Auto Pak and Southbridge, that under the contribution theory of *Dole v. Dow Chemical Co.*, 30 N.Y.2d 143, 331 N.Y.S.2d 382, 282 N.E.2d 288 (1972), Southbridge was liable for 40 per cent of any damages assessed against Auto Pak in favor of appellant. In view of the court's ultimate ruling on liability, it never reached the question of damages.

per is completely enclosed and opposite the deflection plate has a door which is hinged on the bottom at approximately three feet off the floor and which swings out and down. The trash theoretically falls down the chute, slides down the angled deflection plate and comes to rest temporarily on top of a horizontal ram located in a cylinder at the bottom of the hopper. When a sufficient amount of trash is collected in the hopper above the ram, an electric eye triggers a 30-second compaction cycle; the ram retracts allowing the trash to fall into the cylinder in front of it, and then slowly moves forward pushing the trash through a "snout" into a long, sausage-type plastic bag. The ram has sharklike teeth, about two and one-half inches long, and is capable of exerting 2,400 lbs. of pressure. This process, which is more accurately described as extrusion than compaction, is repeated by further triggerings of the electric eye until the bag is filled, at which time the machine stops, a porter ties off and removes the bag, replaces it, and reactivates the machine.

The Gobbler was advertised by Auto Pak as being "completely automatic" and "specifically designed for use where large volumes of refuse must be compactly and automatically stored, for later removal from the premises." In fact it needed constant manual assistance. The Southbridge superintendent, Mr. Herman, like certain other Gobbler users, found that it was desirable to have an attendant with the machine whenever it was turned on, otherwise either trash would stick above the ram, block the electric eye and trigger the compaction cycle continuously, or trash would stick or "bridge" up above in the chute or hopper, thereby preventing any other trash from falling down to the ram. The bridging problem was not disclosed in the Gobbler manual, because, according to a representative of the company that made the installation for Southbridge, the manufacturer "wouldn't print the faults." However, the bridging difficulty had been communicated to the vice president of Auto Pak who had designed the compactor, but no instructions on what to do about it were given. The

Southbridge supervisors, like other Gobbler users, devised their own procedure for handling the bridging problem. They supplied their porters with sticks and told them to open the hopper door and poke the bridged trash with the stick until the trash fell down. There was conflicting testimony as to whether or how emphatically the porters were told to turn off the machine with one of the two available switches before opening the hopper door. Appellant, in whose favor we are obliged to interpret the evidence, testified that he was never instructed to turn off the machine while poking at bridges; another porter testified that the hopper door was always open when porters were working at compactors. One problem with having the door open was that refuse could fall down the chute, bounce off the deflection plate and richochet out the hopper door. In order to prevent this, a porter would have had to close the fire door, thereby separating the compactor from the chute. Apparently this was quite difficult at the time of the accident—one porter said, "You had to put a lot of strength in it"—and was rarely, if ever, done. Another problem with the stick-poking that manual assistance required was that, unless the switch was turned off, the Gobbler would continue to operate while the poking went on; in other words, it was not equipped with an interlocking device whereby the opening of the hopper door would automatically turn off the machine. A third problem with the machine—as Merced was told by Mr. Nelson, "the big boss"—was that rugs, carpets, boards and the like could "break" the machine, and glass and other sharp objects could tear the plastic bags. As a consequence, Merced was instructed to pick these items out of the hopper before they went through the ram cycle. The internal problems of the machine were accentuated by the fact that Merced was responsible to Southbridge for a number of other jobs so that he had only an hour and a half to prepare the rubbish for the morning pickup.

Appellant Merced observed the Gobbler in operation about three months before he

actually started operating the machine in April or May of 1972. On July 13, 1972, appellant began work at 8:00 a. m. on the compactor as usual. At about ten o'clock, he was still working at it. With the hopper door open and the ram in operation, he was breaking up a bridge in the chute with his stick. He spotted a piece of wood which he thought would jam the machine lying or stuck on the deflection plate above and beyond the ram. As he reached, with his head in the hopper door, to take out the piece of wood, a bottle fell down the chute, bounced off the deflection plate and hit him in the head. As a result he was momentarily dazed and could not react when more refuse came down and pushed his hand in front of the ram. His hand was severed from his arm. He testified that he had not turned off the switch before reaching for the piece of wood because if he had taken the time to stop the machine the piece of wood would have fallen in front of the ram and would have created "a kind of problem that could break the machine."

Appellant's expert testimony indicated that the design of the machine was improper and that there should have been a direct feed or other device, such as a revolving screw, so that the refuse would be less likely to bridge. The expert also indicated that since the machine required manual assistance, good and accepted engineering practice required the installation of an interlock on the hopper door so that each time the door was opened the machine would automatically be turned off. The Auto Pak expert admitted that if the machine required the assistance of a porter to make sure that the trash fell down to the ram, as

a purchaser you "should get your money back on the machine."

In setting aside the jury verdict for appellant, note 2 *supra*, Judge Tyler made four points: (1) that plaintiff was guilty of contributory negligence[4] and "not one for whom the dangers of usage amounted to a latent or concealed defect"; (2) that it is still the law of New York under *Campo v. Scofield*, 301 N.Y. 468, 95 N.E.2d 802 (1950), that a manufacturer owes to remote users only a duty to make a device "free from latent defects and concealed dangers" and that no reasonable factfinder could conclude that the occurrence of garbage blockages was a latent or concealed danger; (3) that the absence of any printed warning was a superfluity as far as Merced was concerned;[5] and (4) that, in respect to breach of warranty, there was no evidence to support the jury's determination that the machine was defective and unfit for use for its ordinary purpose and, even if the garbage blockages could be considered a latent design defect, the injury sustained here could not be considered proximately caused by the defect, referring to *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 156–59, 350 N.Y.S.2d 644, 647–51, 305 N.E.2d 769, 771–74 (1973), and again to *Campo v. Scofield, supra*.

 Under the law of New York, a manufacturer may be liable for injuries resulting from the use of his product if the manufacture or design of the article was negligent, *Campo v. Scofield, supra*,[6] or if the defect causing the injury was in breach of an implied warranty of merchantability or fitness of the product, under a theory of "strict products liability," *Codling v. Paglia*, 32 N.Y.2d 330, 343, 345 N.Y.S.2d 461, 470, 298 N.E.2d 622, 629 (1973).[7] In *Bolm v.*

---

4. New York has since the date of Merced's accident adopted comparative negligence in actions to recover damages for personal injury. 7B N.Y.C.P.L.R. § 1411 (McKinney Supp.1975).

5. Although the jury was instructed on a manufacturer's duty to warn of hidden defects, the jury did not indicate in its special verdict that the manufacturer's failure to warn was negligent. We do not consider this matter further.

6. A theory of implied warranty was not considered in *Campo v. Scofield*, 301 N.Y. 468, 471,

95 N.E.2d 802, 803 (1950), properly under the then current law, because there was no claim of privity of contract between the manufacturer and the injured plaintiff. Under current New York law, privity of contract is not a prerequisite for recovery for breach of implied warranty of merchantability and fitness. *Goldberg v. Kollsman Instrument Corp.*, 12 N.Y.2d 432, 240 N.Y.S.2d 592, 191 N.E.2d 81 (1963).

7. Professor Twerski, in *From* Codling, *to* Bolm *to* Velez: "*Triptych of Confusion*," 2 Hofstra L.Rev. 489 (1974), states that the court in *Co-*

*Triumph Corp., supra,* 33 N.Y.2d at 158, 350 N.Y.S.2d at 650, 305 N.E.2d at 773, the court extended the liability of manufacturers for "unreasonably dangerous (latent) design defects" under the implied warranty or strict liability standards articulated in *Codling.*[8] Although these two theories of liability, negligence and breach of warranty, had somewhat different origins, it will be seen that they are closely related in theory, 2 F. Harper & F. James, The Law of Torts § 28.32 (1956), and have certain of the same features under New York law. The one which most concerns us is that it is a necessary, though not sufficient, condition of the manufacturer's liability to the user of a product that the injured plaintiff show that he could not, by the exercise of reasonable care, discover the defect and perceive its danger prior to his injury. *See Bolm v. Triumph Corp., supra,* 33 N.Y.2d at 159, 350 N.Y.S.2d at 650, 305 N.E.2d at 773; *Codling v. Paglia, supra,* 32 N.Y.2d at 342, 345 N.Y.S.2d at 469–70, 298 N.E.2d at 628–29.

Under either theory of liability, a plaintiff cannot recover in New York for injuries resulting from his willful exposure to a known or "patent" danger in the use of a product. It was established in *Campo v. Scofield, supra,* and reaffirmed in *Inman v. Binghamton Housing Authority,* 3 N.Y.2d 137, 164 N.Y.S.2d 699, 143 N.E.2d 895 (1957), that a manufacturer is not negligent if the defect or danger in a product is "patent"—a buzz saw, an axe, an airplane propeller were examples used by the Court of Appeals in *Campo* to typify a product with patent danger. The *Campo* doctrine has been much criticized.[9] Some commentators and judges have, more charitably perhaps, looked at it as merely another way of stating an underlying theory of non-liability where the injured user is contributorily negligent or voluntarily assumes a known risk, *see* Restatement (Second) of Torts § 402A, comment *n* (1965), and to the extent that it involves a consideration of a plaintiff's behavior in relation to the defect it obviously overlaps those time-worn doctrines of tort law.[10] One such commentator

*dling* "apparently" established strict products liability as a cause of action independent from traditional tort and contract liability. *Id.* The court stated in *Velez v. Craine & Clark Lumber Corp.,* 33 N.Y.2d 117, 124–25, 350 N.Y.S.2d 617, 623, 305 N.E.2d 750, 754 (1973), that "strict products liability sounds in tort rather than in contract."

We need not consider the applicability of the New York Uniform Commercial Code since Auto Pak never alleged a disclaimer of any warranty and a disclaimer would not in any event be extended in a strict products liability case to an employee of the purchaser if that employee never knew of the disclaimer.

8. *Bolm v. Triumph Corp.,* 33 N.Y.2d 151, 350 N.Y.S.2d 644, 305 N.E.2d 769 (1973), extends manufacturer's liability so as to permit recovery for aggravation of injuries caused by a product defect even though the defect did not cause the original accident; at the same time its language restates as New York law what Twerski, *supra* note 7, at 505, calls "one of the most heavily criticized and ill starred rules extant in products literature"—the "patent danger" rule of *Campo v. Scofield,* 301 N.Y. 468, 95 N.E.2d 802 (1950).

9. *See* 2 F. Harper & F. James, The Law of Torts § 28.5 (1956); Donaher, *Technological Expert in Products Liability Litigation,* 52 Texas L.Rev. 1304 (1974); Donnelly, *Commercial Law, 1973 Survey of American Law,* 25 Syr.L.Rev. 219

(1974); Donnelly, *Commercial Law, 1972 Survey of American Law,* 24 Syr.L.Rev. 219, 225 (1973); Donnelly, *Commercial Law, 1971 Survey of American Law,* 23 Syr.L.Rev. 373 (1972); Marshall, *An Obvious Wrong Does Not Make a Right: Manufacturer's Liability for Patently Dangerous Products,* 48 N.Y.U.L.Rev. 1078 (1973); Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product,* 71 Yale L.J. 816 (1962); Rheingold, *The Expanding Liability of the Products Supplier: A Primer,* 2 Hofstra L.Rev. 523, 541 (1973); Twerski, *supra* note 7, at 505; *cf.* W. Prosser, The Law of Torts 649 n.83 (1971). Some authors have suggested, perhaps prematurely, in light of some of the language in *Bolm,* that *Campo* is no longer good law in New York. Donnelly, *1972 Survey, supra,* at 327; Donnelly, *1971 Survey, supra,* at 376. *Cf.* Rheingold, *supra,* at 524.

10. Most American courts have rejected contributory negligence as a defense to a products case but have followed Restatement (Second) of Torts § 402A, comment *n* (1965), in stating that only voluntary and unreasonable assumption of the risk is a defense. *See* Twerski, *supra* note 7, at 496 n.30. That defense is that "If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it he is barred from recovery." Restatement (Second) of Torts, *supra,* comment *n.* Such would be the case if

put it this way: "the *Campo* decision indicates simply that obviousness of the defect, or even of the danger itself, should be one significant factor in the determination of whether or not the manufacturer has created an unreasonable risk." Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product*, 71 Yale L.J. 816, 837 (1962). *See also* Clark, *J.*, dissenting in *Messina v. Clark Equipment Co.*, 263 F.2d 291, 293 (2d Cir.) (interpreting *Campo* as not shifting "the basic inquiry as to the reasonable foreseeability of the danger to a sterile definitional quibble over whether the injury was caused by a 'latent' or a 'patent' defect"), *cert. denied*, 359 U.S. 1013, 79 S.Ct. 1150, 3 L.Ed.2d 1037 (1959).

We need not, however, take a position on whether the more charitable view of the *Campo* decision is correct, since *Campo* itself has been modified and the focus of our inquiry has been redirected by *Bolm v. Triumph Corp., supra*, even while that decision spoke in some of the same latent/patent language of *Campo*. In *Bolm* the Court of Appeals held that *Campo* is not a bar to all "second collision" recovery, permitting the plaintiff to go to the jury on the issue whether the dangers from a design defect are latent or patent. The Court of Appeals went on to say:

> As mentioned above, we qualify our affirmance with a notation that the issue as to the latency or patency of the dangers from the design defect—if the jury determines there was a design defect—presents a question of fact which should not have been resolved by the Appellate Division on appeal from the motion for summary judgment. As Chief Judge Cardozo stated in *Palsgraf v. Long Is. R. R. Co.*, 248 N.Y. 339, 345, 162 N.E. 99, 101, "The range of reasonable apprehension is at times a question for the court, and at

times, if varying inferences are possible, a question for the jury." Here the duty and, thus, the liability of the manufacturer turn upon the perception of the reasonable user of the motorcycle as to the dangers which inhere in the placement of the parcel grid on top of the gas tank. That is a question of fact which should be submitted, with the other issues, for jury consideration.

33 N.Y.2d at 159–60, 350 N.Y.S.2d at 651, 305 N.E.2d at 774. The language of the opinion is susceptible to an interpretation that a generally patent danger is sufficient to result in non-liability. *See* Twerski, *From* Codling, *to* Bolm *to* Velez, *Triptych of Confusion*, 2 Hofstra L.Rev. 489, 511–12 (1974). However, the decision to permit the jury to determine on the facts of the *Bolm* case the latent/patent question necessarily leads to the conclusion that it is the *precise* danger which must be patent. *Cf.* W. Prosser, Law of Torts § 447 (4th ed. 1971); Restatement (Second) of Torts, *supra*, § 496D, comment *b*. In *Bolm* a metal luggage rack or parcel grid was affixed in front of the driver's seat above the motorcycle gas tank. By insisting that the case go to the jury over Judge Jones' dissent, therefore, the Court of Appeals must have been reading into the test an element of foreseeability of the *precise* risk that ultimately caused injury: there an accident throwing the driver forward into the defectively designed or placed luggage rack. We turn now to the applicability of the New York law to the case at hand.

■ Our first question is as to the defectiveness of the machine. There can be no doubt that the record contains ample evidence to support the express jury determination that the Auto Pak Gobbler was a defective product that was negligently de-

---

appellant had reached in front of the advancing ram. Left in doubt in the New York law, but a problem we need not face, is whether a plaintiff has the duty to inspect a product to discover the defect. Left in doubt also and a problem which we *do* need face is whether the rule is that this plaintiff must have understood the risk or whether a reasonable user must have understood it. As will be seen we are

forced to resolve this against appellant, but we also conclude that the test is whether a reasonable plaintiff would have discovered the defect *and* perceived the *particular risk* which actually developed. *See* Twerski, *supra* note 7, at 500–01. We are of the view, incidentally, that this is merely the converse way of stating the *Campo* rule as modified by *Bolm, supra*.

signed and not suitable for the purpose intended of automatic trash compaction. At least three separate defects found by the jury are positively supported by the record. First, every witness except one [11] who testified on the operation of the compactor agreed that bridging of garbage above the deflector plate did occur and that manual assistance was at least sometimes necessary [12] to make the trash fall down into the bottom of the Gobbler. The jury put it well by saying that the machine was defective because "A mechanical device to avoid 'bridging' was not incorporated in the design." Note 2 *supra*. Second, two witnesses testified that, if various objects were not removed from the Gobbler before they reached the ram, they would split open the plastic bags when extruded into them, thus requiring continuous surveillance of the machine during its operating cycle. Finally, the jury found, with ample evidence, that "no protection was afforded from objects ricocheting from deflection plate when hopper door was open" and that "the machine should have been provided with additional safeguards such as an interlock on the Hopper door." Note 2 *supra*.[13] Expert testimony supported the proposition that these various defects were engineering and design defects and, as to breach of warranty, even appellee's own expert conceded that if the machine required manual assistance the purchaser should "get [his] money back." We think the record amply supports the jury's findings that the Gobbler was defective.

The record also supports the jury's conclusion that the injury to Merced was proximately caused by the defective condition of the Gobbler. The jury could have reasonably concluded from the evidence that it was the combination of the bridging problem, the necessity of leaning into the machine to remove an obstacle, and the fact that the machine could operate even when the hopper door was open, which led to Merced's injury.

We read Judge Tyler's decision setting aside the verdict as based primarily on what was in his view a lack of evidence from which the jury could reasonably conclude that the defects, and the dangers created by the defects, were not known to Merced, or discoverable by him through "the exercise of reasonable care," *see Bolm v. Triumph Corp., supra*. While all the evidence on the matter may indicate that the defects were known to Merced, and perhaps understood by him, we disagree with the judge that the particular risks flowing from these defects, working in combination, would necessarily have been apprehended by the appellant, or would be by a reasonable user. Thus, the evidence indicates that Merced was aware, as any reasonable man would be, that an object could fall down the chute and bounce off the deflection plate; indeed on one occasion a broken barrel fell down and slashed one part of Merced's arm. But the New York Court of Appeals has been quite explicit in *Bolm* in its warning to trial judges in products liability cases as well as in analogous contributory negligence cases that "the perception of the reasonable user . . . as to the dangers which inhere" in a defective product is a question of fact *to be submitted to the jury*. 33 N.Y.2d at 160, 350 N.Y.S.2d at 651, 305 N.E.2d at 774. Here, as in *Bolm*, a reasonable user [14] of the Gobbler would undoubtedly be aware of the defective design and general danger of be-

---

11. Appellee Auto Pak's expert witness testified that he did not believe bridging occurred, but agreed that if it did the purchaser's money should be refunded.

12. Despite Judge Tyler's finding that bridging "occasionally" occurred, we must assume, as does appellee on argument, that bridging "occurred with some frequency."

13. A fourth defect which the jury could have found was that if the machine were left on unattended, debris might block the electric eye and cause the machine to run continually without extruding trash; this was one more reason that the machine required manual assistance.

14. We are also of the opinion that the jury could have found that Merced in particular did not perceive the specific danger, but a conclusion on that issue need not be reached under the reasonable user standard articulated in *Bolm*.

ing struck by bouncing objects. But the jury could conclude that such a user could fail to perceive the particular danger of having at the same time both his hand above the ram and his head near enough to be struck by a flying object bouncing off the deflection plate, so that when he was dazed his hand might then be pushed in front of the operating ram. Furthermore, it could not be found as a matter of law that a reasonable user must have been aware of a continuing danger of injury from a ricocheting object from one isolated incident, since "[m]omentary forgetfulness is · not negligence as a matter of law." *Schneider v. Miecznikowski*, 16 A.D.2d 177, 178, 226 N.Y.S.2d 944, 945 (1962). Again, "[t]he failure to have in mind the existence of a dangerous condition at the time one encounters it, even though there had been knowledge of the condition in the past, does not constitute contributory negligence as a matter of law." *Rugg v. State*, 284 App. Div. 179, 183, 131 N.Y.S.2d 2, 6 (1954). We note in holding the manufacturer liable that the combination of circumstances which caused the injury all arose from machine defects. Under the applicable standard of the *Bolm* gloss on *Campo*, we conclude that there was sufficient evidence to raise a jury question, and to support a jury verdict, on the issue whether a reasonable user would have apprehended the scope of the dangers resulting from the Gobbler's defects.

Judge Tyler also ruled that there was insufficient evidence to support the jury conclusion that Merced was not contributorily negligent in the accident which produced his injury. In considering the sufficiency of the evidence to sustain the jury determination on this question, one obviously intertwined with the liability question, we are obliged under New York law to give appellant the benefit of all favorable inferences. *Philpot v. Brooklyn National League Baseball Club, Inc.*, 303 N.Y. 116, 119, 100 N.E.2d 164, 165 (1951) (baseball spectator hit by dropped bottle not contrib-

utorily negligent by attending game). It is, to be sure, essential in proving lack of contributory negligence that the pleader show that he was, at the time of the occurrence, using the product for the purpose and in the manner normally intended. *Codling v. Paglia, supra*, 32 N.Y.2d at 343, 345 N.Y. S.2d at 470–71, 298 N.E.2d at 629. Clearly appellant was using the Gobbler for the purpose intended, *i. e.*, to extrude trash collected under normal operating conditions in the apartment building. Clearly also, the use of sticks or similar apparatus to break up bridging was widespread and, although perhaps not originally intended, was indeed known to, if not acquiesced in, by the manufacturer; it certainly was a reasonable method of dealing with that design defect. Whether temporarily placing one's head in the open hopper door is "normal" in the sense that it is a common practice of Gobbler operators is not at all clear from this record. The question of normal manner of use is determined by consideration of whether or not the dangerous handling of the product should reasonably have been foreseen by the manufacturer. *Noone v. Fred Perlberg, Inc.*, 268 App.Div. 149, 152, 49 N.Y.S.2d 460, 463 (1944), *aff'd*, 294 N.Y. 680, 60 N.E.2d 839 (1945); Restatement (Second) of Torts, *supra*, § 395, comment *j*. *See* Noel, *Manufacturer's Negligence of Design or Directions for Use of a Product, supra*, 71 Yale L.J. at 858.[15] In light of the evidence that the machine needed manual assistance not only to break up bridging but also for the removal of any object that might break or jam the machine or tear the bags, .we cannot hold that the jury would have been unreasonable in specifically finding that appellant in using one hand and a stick to do one thing and the other hand to do the other, was using the machine in a manner Auto Pak could have reasonably foreseen, and thus "in a manner normally intended."

To be sure, the jury could have found that appellant was contributorily

---

**15.** Twerski, *supra* note 7, at 497, states that there is "general agreement that [normal use] is nothing more than another way of stating the proximate cause issue," citing Noel, *Defec-*

*tive Products: Abnormal Use, Contributory Negligence and Assumption of Risk*, 25 Vand.L. Rev. 93, 96 (1972).

negligent for failing to avert his injury either by stopping operation of the ram before reaching in or by closing the fire door in the chute before placing his head in the hopper. The jury concluded, however, that there was no negligence by Merced in failing to do so. In reviewing the sufficiency of the evidence to support that determination, we must be cognizant of New York law, overlooked below, that when an employee is instructed by his superiors to proceed under circumstances recognizable as dangerous and stays within the limits of those instructions, he will not be charged with contributory negligence as a matter of law. *Broderick v. Cauldwell-Wingate Co.,* 301 N.Y. 182, 188, 93 N.E.2d 629, 632 (1950). *See also Kaplan v. 48th Ave. Corp.,* 267 App.Div. 272, 274, 45 N.Y.S.2d 510, 512 (1943). Merced's evidence was that at the time of the accident he was doing precisely what he understood from his superiors to be his job at the compactor, *i. e.,* removing certain types of refuse to prevent machine jams and allowing the free flow of trash by breaking up bridging. Although he could have shut off the machine whenever he found it necessary to place part of his body inside the hopper, he testified that in this instance there was not sufficient time to prevent "breaking" the machine, and, as a general practice, third-party defendant Southbridge's own foreman testified that shutting off the machine every time bridging occurred would result in taking five hours to do the job for which appellant had an hour and a half. While appellant might have closed the fire door, there was evidence that to do so would have been quite difficult and there was evidence that Southbridge porters simply did not shut the fire doors while operating compactors. In New York the issue of contributory negligence is almost exclusively for the jury, *Wartels v. County Asphalt, Inc.,* 29 N.Y.2d 372, 379, 328 N.Y.S.2d 410, 416, 278 N.E.2d 627, 631 (1972), and as such ought not be overturned if it "is, at least, reasonably arguable" that appellant was not contributorily negligent. *Rossman v. LaGrega,* 28 N.Y.2d 300, 309, 321 N.Y.S.2d 588, 595, 270 N.E.2d 313, 317–18, (1971) ("we ought not extend the perim-

eters of this unsatisfactory doctrine [contributory negligence] wider than we need to"). As a consequence we believe that under this set of facts appellant was entitled, as a matter of New York law, to a decision by a jury on the issue of contributory negligence. Thus the verdict of liability must stand.

Since we are unable to find any evidence in the record other than Judge Tyler's statement in his opinion that the cause of action of Modesta Merced was abandoned at trial, and since appellants' brief denies all awareness or intention of abandoning Mrs. Merced's claim and this assertion is not addressed in the briefs of opposing counsel, we leave the reinstatement of her claim for resolution by the district court on remand.

The jury verdict of Auto Pak's liability to appellant Felix Merced is reinstated and the cause of action for damages of Modesta Merced is left open for consideration by the court below on the remand which we order hereby.

Judgment reversed and cause remanded.