ANGLO EASTERN BULKSHIPS
LIMITED and Anglo Nordic
Shipping Limited, Plaintiffs,

v.

AMERON, INC., Defendant.

No. 77 Civ. 5233.

United States District Court,
S.D. New York.

July 8, 1982.

Walker & Corsa, New York City, for plaintiffs; Hollis M. Walker, Jr., Steven P. Calkins, Vera E. Weinberg, New York City, of counsel.

Le Boeuf Lamb Leiby & MacRae, New York City, for defendant; Geoffrey D.C. Best, Frederick R. Dettmer, Gwenellen P. Janov, Dennis P. Harkawik, New York City, of counsel.

SOFAER, District Judge:

Plaintiffs in this action are Anglo Nordic Shipping Limited ("Anglo Nordic"), a Bermuda corporation, and its wholly owned subsidiary Anglo-Eastern Bulkships Limited ("Anglo-Eastern"), a British corporation. The defendant is Ameron, Inc., ("Ameron"), a California corporation. Ameron owns Amercoat Europa N.V., a Netherlands cor-

poration engaged in the marine coatings trade. Plaintiffs seek substantial damages from defendant Ameron and its subsidiary Amercoat on four theories of liability—negligence, strict products liability, breach of implied warranty of fitness, and strict liability for misrepresentations. Pre-Trial Order 4–7. Amercoat, though, is not a defendant in this case, and plaintiffs' motion at trial to amend their complaint to add Amercoat was improper and meritless.[1] Consequently, plaintiffs' claims must be decided in accordance with defendant Ameron's liability, and acts of Amercoat for which Ameron is not responsible afford plaintiffs no basis for recovery.

## I. Factual Background

On approximately June 2, 1970, Anglo-Eastern contracted with Swan Hunter Shipbuilders Limited ("Swan Hunter") for the construction by Swan Hunter of two nearly identical ships to be used to carry oil and other products. Anglo-Eastern chartered the planned vessels to its parent Anglo Nordic in July 1970. In January 1971, Anglo Nordic time chartered the planned vessels to Eurochem Shipping NV ("Eurochem"), a Netherlands corporation. Because Eurochem wished to transport chemical cargoes, plaintiffs ordered Swan Hunter to construct the ships as chemical carriers. The time charter between Anglo Nordic and Eurochem provided that the tanks in the new vessels would have coatings capable of carrying all the chemicals in Amercoat's product suitability list of 1970, which was appended to the agreement and expressly incorporated.

To carry chemicals safely, the storage tanks on a ship must be specially coated. An effective coating serves two important purposes: it prevents the tanks from corroding and it protects the chemical cargoes

from contamination by either the tanks or the remnants of previous cargoes. Different types of tank coatings are necessary to carry different types of chemicals. Originally, plaintiffs intended to coat two-thirds of the thirty-three tanks on each of its new vessels with an epoxy-based coating and one-third with a zinc-based coating. This ratio was changed at the request of Eurochem, however, so that twenty-four of the tanks on each vessel were eventually coated with a zinc-based material, and nine with an epoxy coating.

The task of coating the storage tanks was subcontracted by Swan Hunter to Metnor Limited ("Metnor"), a British corporation that specialized in the coating process. Plaintiffs considered the coating products of a number of manufacturers before deciding to have Metnor coat the tanks with products made by Amercoat. The zinc-based coating plaintiffs eventually chose was Dimetcote-4 ("Dimetcote"), and the epoxy coating chosen was Amercoat 64/66 ("A–64/66"). Dimetcote is an inorganic substance generally used to coat tanks that will carry neutral solvents but not acid or alkaline materials. A–64/66 is an organic coating best used to carry alkalines and sometimes used for acids, but generally not used to carry neutral solvents. Amercoat, like other manufacturers of coating products, provided potential customers and actual purchasers with detailed information about the types of chemicals that could be safely carried in tanks coated with a given substance. Amercoat's product suitability lists and technical data sheets also contained the limitations, if any, that Amercoat placed on the carriage of approved chemicals in tanks coated with the products it sold. Plaintiffs were provided with such documents prior to their decision to use Amercoat products. PX 229:RN at 133–35, 137.[2]

---

**1.** This court has no jurisdiction over Amercoat, as Judge Werker previously held. *Anglo-Eastern Bulkships Ltd. v. Ameron, Inc.*, 77 Civ. 5233 (S.D.N.Y. Aug. 9, 1978). Moreover, the motion to amend was untimely, coming after about two years of discovery. Until 1972, fifty percent of Amercoat was owned by Chamotte Unie, N.Y., a Netherlands Corporation, and fif-

ty percent was owned by Ameron. On June 30, 1972, Ameron became the sole owner of Amercoat.

**2.** References to the trial transcript are cited as "Tr." followed by the page number(s) on which the material appears. Plaintiffs' and defendant's exhibits are cited as PX and DX, some-

Tank coatings must be properly applied and cured before any chemical cargo can be carried; otherwise, the coating will fail to prevent corrosion and cargo contamination. "Curing" is the process by which a coating, after it has been applied, becomes fully capable of performing its protective functions. *See* Tr. 505. Curing is accomplished in a number of ways, including the introduction of heat, water, or other chemicals into the tanks. The curing process can be lengthy, and it continues even past the time when the tank is ready to carry certain chemicals. Some cargoes, in fact, may promote the curing process and are sometimes carried on a vessel's first voyage with that purpose in mind. Moreover, careful tank maintenance and restrictions on the carriage of certain chemicals are necessary to ensure continued coating effectiveness.

Swan Hunter delivered the CHEMICAL EXPLORER to plaintiffs on May 4, 1972. Plaintiffs then attempted to deliver the vessel to Eurochem pursuant to their charter agreement, but Eurochem refused to accept the vessel, claiming that the ship's tanks might not be ready to carry the cargoes designated as proper in the charter party. The next day, however, Eurochem accepted delivery after expressly reserving certain rights. Among other things, Eurochem took the position that the Dimetcote tanks were not clean and were not "properly cured for the carriage of methanol and other low molecular weight solvents and that the Amercoat 64/66 tanks [were] not properly cured for the carriage of any chemicals." DX 20.

Swan Hunter delivered the CHEMICAL VENTURER to Eurochem on September 4, 1972. Amercoat assured plaintiffs that the coatings on all the tanks on this ship had been applied and cured in accordance with their instructions, and that the tanks were ready to accept cargoes listed in Amercoat's June 1971 product suitability list. PX 97. Eurochem accepted delivery.

times followed by appropriate page cites. Depositions are cited by the initials of the depo-

The subsequent history of the Dimetcote and the A–64/66 tanks on the CHEMICAL EXPLORER and the CHEMICAL VENTURER reveals that there were serious problems with the tank coatings on both vessels, particularly on the former. Plaintiffs commenced this action in 1977 to recover damages for repairs to the coatings and for the time the vessels were out of service. *See* Pl. Trial Brief 8–11; Pl. Post-Trial Brief 42–62.

## II. Governing Law

Defendant argues that English law should govern this lawsuit. Both the vessels involved sail under the flag of Great Britain. Much of the allegedly negligent conduct occurred in Britain or Europe, including the coating applications and the development and issuance of Amercoat's product suitability lists. Plaintiffs are corporations organized under the laws of England and Bermuda, and they do business in England and Scotland as well as in New York. The relevant contract—to coat the tanks—was made and carried out in England. Most of the participants in the alleged tort are European. And plaintiffs have themselves expressed a preference for British law in other contexts. *See generally Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *Lauritzen v. Larsen,* 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

Plaintiffs correctly contend, however, that a weighing of all the relevant factors makes the application of American law proper in this case, as Judge Werker earlier assumed. Plaintiffs carefully note:

The "wrongful acts" complained of herein comprise defendant's misrepresentations concerning the products which could be carried in tanks coated with their products and/or defendant's negligent testing of the products in question and/or failure to test and/or failure to be guided by test results.

nent.

Pl. Post-Trial Reply Brief 5. Defendant Ameron, in short, is not being sued for the acts of its subsidiary Amercoat, except to the extent those acts were adopted by Ameron as its own. Therefore, the allegedly wrongful acts in this proceeding are those of an American company, done to the detriment of Anglo Nordic, an American-based corporation.

The flag is entitled to little weight, because the flag chosen for the vessels was one of convenience, not one that reflected the parties' allegiance; in this case, the parties are as strongly connected to this jurisdiction and its laws as they are to Britain and its laws. *See Grivas v. Alianza Compania Armadora, S.A.,* 276 F.2d 822, 824–25 (2d Cir.1960); *Bartholomew v. Universe Tankships, Inc.,* 263 F.2d 437, 439 (2d Cir.), *cert. denied,* 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959). The place of contract is entitled to little weight in this analysis, because plaintiffs are suing in tort, not in contract. Likewise, the place where the coatings were applied has little bearing on defendant's liability. Plaintiffs' argument on this point is convincing, and it is significant in that it properly describes the limits of the claims that plaintiffs have made:

> The relevant events in the case in suit had nothing to do with the execution of any contract; in fact, the contracts which were eventually executed were not between the parties to this law suit. The most relevant events, of course, are those which took place in the United States *prior* to the making of any contract.
>
> Defendant urges that the negligent acts complained of have a European cast. Certainly plaintiffs agree that there were many negligent Europeans, most of whom worked in Holland and not in England. What seems to have escaped defendant is that plaintiffs have and are now urging that defendant was initially negligent in adopting and ratifying the negligently prepared Products Suitability Lists and other literature issued by its European subsidiary. These lists, as well as catalogues and brochures were relied upon by plaintiffs' representatives in de-

ciding to have their vessels' tanks coated with Amercoat 64/66 and D–4.

Pl. Post-Trial Reply Brief 7–9 (footnotes omitted). Given this theory of plaintiffs' case, the law of the United States, rather than the law of the flag, is the proper law to apply.

### III. Vicarious Liability for Acts of Amercoat

■ Defendant contends that it cannot be held liable for the acts of Amercoat because plaintiffs have failed to prove that Ameron dominated Amercoat to the extent legally necessary to make it responsible for the acts of its subsidiary. Plaintiffs correctly respond that this issue is not actually presented. Plaintiffs do not contend that defendant is vicariously liable for the acts or omissions of Amercoat, but only for defendant's own acts or omissions. This case is not simply an attempt to hold a parent liable for the tortious acts of its subsidiary.

Plaintiffs allege that Ameron was involved, sometimes intimately, sometimes tangentially, with many of the activities that gave rise to this lawsuit. The coating products were manufactured by Amercoat pursuant to a licensing agreement between Ameron and Amercoat. *See* PX 30. Ameron developed the original formulas for the coatings and provided them to Amercoat. PX 234:ND at 17–18; Tr. 554. The products were packaged in containers bearing a trademark registered by Ameron. PX 123; Tr. 497. Ameron and Amercoat were in constant contact regarding coating products, PX 222:JV at 38–42; Tr. 812–15; and Ameron was directly involved in the development and publication of the product suitability lists ("PSLs") involved in this dispute, PX 219:JR at 19–22. Although Ameron lacked day-to-day control over the operations of Amercoat, its approval was required for all major financial undertakings, managerial changes, and corporate policy decisions on all claims arising out of use of Amercoat products. Ameron sales representatives made the first attempts to convince plaintiffs to use Amercoat products on the CHEMICAL EXPLORER and the

CHEMICAL VENTURER. Under these circumstances, Ameron may not escape liability by asserting its independence from its subsidiary. The issue in the case is whether Ameron was sufficiently involved in the alleged breaches of duty, and had sufficient control over its wholly owned subsidiary with respect to the activities involved in this lawsuit, to be held liable for its own acts or omissions, including any failure to exercise the control it had over Amercoat. *See E.I. du Pont de Nemours and Co. v. McCain,* 414 F.2d 369, 372–73 (5th Cir.1969).

Plaintiffs' claims are based almost entirely on alleged deficiencies in the PSLs issued by Amercoat, which they claim were adopted by Ameron. The evidence at trial established that Amercoat was primarily responsible for product testing and for the formulation of PSLs. But Ameron personnel closely followed Amercoat's operations, advised on everything from testing methods to the terms of the PSLs, and in fact could (and occasionally did) control both the testing process and the contents of PSLs. When Ameron sold coating products manufactured in the United States, and when it presented Amercoat products for sale, the PSLs used by Ameron were those prepared by Amercoat, under Ameron's ultimate supervision. No other PSLs existed. In fact, in recommending the products plaintiffs eventually chose, Ameron personnel gave plaintiffs Amercoat's PSLs. Ameron therefore was or should have been aware of, and could have corrected, any deficiencies in Amercoat's product testing and representations to purchasers. Consequently, Ameron is responsible for such deficiencies.

## IV. Breach of Duty

Plaintiffs' arguments are founded upon four theories of liability: negligence, strict products liability, breach of implied warranty of fitness for intended use, and strict liability for misrepresentations. *See* Pre-Trial Order 4–7; Pl. Post-Trial Brief 104–15; Pl. Post-Trial Reply Brief 44–45, 89–91. Each theory requires proof not only of causation but of defendant's breach of some duty it owed to plaintiffs. Plaintiffs have failed to prove the existence and breach of a duty under any of the four theories.

Under plaintiffs' negligence theory, defendant owed a duty to exercise reasonable care in the testing and representation of its products. *See* W. Prosser, *The Law of Torts* 644–45 (4th ed. 1971). Under the strict products liability theory, defendant owed plaintiffs a duty to sell tank coatings that were not "in a defective condition unreasonably dangerous" to plaintiffs' property. *Restatement (Second) of Torts* § 402A (1977). If, as plaintiffs urge, the duty is defined without the "unreasonably dangerous" requirement, then defendant's duty under the strict products liability theory was simply to provide a product that was not defective; that is, a product that was "reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes." Pl. Reply Brief 89–91 (quoting *Dawson v. Chrysler Corp.,* 630 F.2d 950, 956–57 (3d Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981)). Under plaintiffs' implied warranty theory, defendant owed plaintiffs a duty, like that under the strict products liability theory, *see Merced v. Auto Pak Co.,* 533 F.2d 71, 75 (2d Cir.1976); *Basko v. Sterling Drug, Inc.,* 416 F.2d 417, 427 (2d Cir.1969); *Dawson v. Chrysler Corp., supra,* 630 F.2d at 955, to provide a product fit for its intended use. Finally, under plaintiffs' theory of strict liability for misrepresentation, defendant owed plaintiffs a duty to avoid any material representations on which plaintiffs could and did justifiably rely. *Restatement (Second) of Torts* § 402B (1977).

Defendant does not contend that plaintiffs may not properly allege negligence and breach of an implied warranty of fitness. *See Compania Pelineon de Navegacion, S.A. v. Texas Petroleum Co.,* 540 F.2d 53, 55 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977); *Montgomery v. Goodyear Tire & Rubber Co.,* 231 F.Supp. 447, 451 (S.D.N.Y. 1964). Defendant argues, however, that in the circumstances of this case plaintiffs have no cause of action for strict liability under section 402A of the *Restatement.*

Although a strict products liability cause of action is, as a general rule, cognizable in admiralty, *see Pan-Alaska Fisheries, Inc. v. Marine Construction & Design Co.,* 565 F.2d 1129, 1134 (9th Cir.1977); *In re Marine Sulphur Transport Corp.,* 312 F.Supp. 1081, 1102 (S.D.N.Y.1970), *aff'd in part, rev'd in part sub nom. In re Marine Sulphur Queen,* 460 F.2d 89 (2d Cir.), *cert. denied,* 409 U.S. 982, 93 S.Ct. 326, 34 L.Ed.2d 246 (1972), a number of strong reasons support defendant's contention.

■ Plaintiffs claim damages only for repairs to defendant's product and for loss of profits while repairs were being made, not for damage to other property or for personal injuries. *See* Pl. Trial Brief 8–11; Pl. Post-Trial Brief 42–62. The majority of jurisdictions follow the rule of *Seely v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), and deny recovery in strict liability for such losses in a commercial setting. *See Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 287 & n. 13 (3d Cir.1980); *Sioux City Community School District v. International Telephone & Telegraph Corp.,* 461 F.Supp. 662, 664 (N.D.Iowa 1978); *Moorman Manufacturing Co. v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); Note, *Economic Loss in Products Liability Jurisprudence,* 66 Colum. L.Rev. 917, 937–42 (1966). Some courts deny recovery in these circumstances on the theory that the product is not "unreasonably dangerous" where, as here, the damages claimed are only for the product's failure to perform as hoped and for economic consequences, and do not result from an unexpected, sudden occurrence such as an explosion or breaking apart of the product. *See Ebasco Services, Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 223–25 (E.D. Pa.1978); *Moorman Manufacturing Co. v. National Tank Co., supra,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443. *Compare The Pochahontas,* 109 F.2d 929, 931 (2d Cir.) (collision; libel action), *cert. denied,* 310 U.S. 641, 60 S.Ct. 1088, 84 L.Ed. 1409 (1940); *JIG the Third Corp. v. Puritan Marine Insurance Underwriters Corp.,* 519 F.2d 171, 175 (5th Cir.1975) (sinking of boat; claim

for negligent design and manufacture), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976).

None of the policies behind *Restatement* § 402A is served in the circumstances of this case. The parties here are large corporations of comparable bargaining power and commercial sophistication; and the terms of the sale of the coatings were negotiated at arm's length. Thus, the principal basis for strict liability—the need to protect innocent consumers not in privity of contract with the seller—is absent in this case. *See Tokio Marine and Fire Insurance Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 939–40 (2d Cir.1980); *Scandinavian Airlines System v. United Aircraft Corp.,* 601 F.2d 425, 428 (9th Cir.1979); *Sioux City Community School District v. International Telephone & Telegraph Corp., supra,* 461 F.Supp. at 664; *American Electric Power Co. v. Westinghouse Electric Corp.,* 418 F.Supp. 435, 452–53 (S.D.N.Y.1976). The cost-internalization basis for strict liability is likewise irrelevant here: the parties did in fact bargain, in a commercial context, over the terms of sale, and the buyer and seller, both large business enterprises, were in relatively equal positions, compared to the typical manufacturer and consumer, to pass on and distribute accident costs. Finally, because successful functioning of the coatings sold by defendant depends heavily on user sophistication and vigilance, and because user experience is essential in learning how to improve the performance of the coatings, plaintiffs were in at least as good a position as defendant "to make the cost-benefit analysis between accident costs and accident avoidance costs and to act on that decision once it is made." Calabresi & Hirschoff, *Toward a Test for Strict Liability in Torts,* 81 Yale L.J. 1055, 1060 (1972).

■ For all these reasons, the strict products liability theory of *Restatement* § 402A should not apply in this case. Assuming, however, that plaintiffs could seek recovery under a strict products liability theory, and that plaintiffs need not prove that the coatings were "unreasonably dangerous," de-

fendant's duty was to provide a product "reasonably fit, suitable, and safe for its intended or foreseeable use." That duty is discharged by providing warnings adequate to put plaintiffs on notice of the coatings' dangers. *Garrison v. Heublein, Inc.,* 673 F.2d 189 (7th Cir.1982); *Lindsay v. Ortho Pharmaceutical Corp.,* 637 F.2d 87, 91–92 (2d Cir.1980); W. Prosser, *supra,* at 669; *Restatement (Second) of Torts* § 402A comment g (1977). Indeed, plaintiffs' strict products liability theory, like its negligence and implied warranty theories, is based on an alleged failure to warn. *See* Pre-Trial Order 6–7; Pl. Post-Trial Brief 104–13. The adequacy of warnings and other representations depends on plaintiffs' independent knowledge of the dangers, for the extent of a user's knowledge determines what uses are foreseeable. In particular, "no one needs notice of that which he already knows." *Billiar v. Minnesota Mining & Manufacturing Co.,* 623 F.2d 240, 243 (2d Cir.1980); *see Garrison v. Heublein, Inc., supra; Lindsay v. Ortho Pharmaceutical Corp., supra; Harrison v. Flota Mercante Grancolombiana, S.A.,* 577 F.2d 968, 977 (5th Cir.1978); *Buffington v. Amchem Products, Inc.,* 489 F.2d 1053, 1056 (8th Cir. 1974).

■ In this case, the evidence, set out below, establishes that, given defendant's warnings and plaintiffs' sophistication and experience in the chemical tanker trade, defendant provided enough information to make reasonably certain that plaintiffs would properly use the coatings; the evidence also establishes that plaintiffs' improper uses were neither intended by nor foreseeable to defendant. Thus, plaintiffs have failed to show by a preponderance of the evidence that defendant's coatings were unfit for their intended or foreseeable uses. From that conclusion it follows that plaintiffs have not shown that defendant breached any duty it may have had under a strict products liability theory. It also follows that plaintiffs have not shown that defendant breached any implied warranty of fitness for intended use.

■ Defendant's representations about its product are challenged as inadequate in two other ways. Plaintiffs assert that defendant misrepresented its products' capabilities and that defendant negligently failed to provide adequate instructions on proper use of its product. Defendant is liable on neither ground. The challenged representations, together with various warnings, were not misrepresentations. Moreover, "the subject matter of the transaction is one upon which both parties [had] an approximately equal competence to form a reliable opinion" and therefore "each must trust [its] own judgment and neither is justified in relying upon the opinion of the other." *See Restatement (Second) of Torts* § 402B, comment g (incorporating *Restatement* § 542 comment d). Thus, even assuming that there were some misrepresentations, any reliance by plaintiffs was not justified. Finally, as shown in detail below, defendant's representations, and the testing on which they were based, were not negligent.

*A. Adequacy of Testing*

Plaintiffs' challenge to the adequacy of defendant's representations encompasses two challenges to defendant's testing. Plaintiffs assert that defendant's testing was deficient because it resulted in inadequate representations, in the PSLs prepared by Amercoat, regarding the suitability of defendant's chemical coatings. Pl. Trial Brief 23–27; *see E.I. du Pont de Nemours & Co. v. McCain, supra,* 414 F.2d at 373–74; *Todd Shipyards Corp. v. Turbine Service, Inc.,* 467 F.Supp. 1257, 1286 (E.D.La.1978); *Hall v. E.I. du Pont de Nemours & Co.,* 345 F.Supp. 353, 360 (E.D.N.Y.1972). Defendant's testing may be deficient either because of methodological weakness in the tests conducted or because of a failure to conduct other tests. Plaintiffs have not established either deficiency.

The testing methods used by Amercoat after about 1970 were the "continuous immersion" method (Test Method 108.01) and, later, the "intermittent" and "sequencing" methods (Test Methods 108.02 & 108.03).

PX 151; Tr. 833. Continuous immersion involves placing small panels covered with the coating under scrutiny in a chemical contemplated for carriage. The "intermittent" method involves placing coated panels for seven days in the chemical being tested, then for seven days in seawater. The "sequencing" method involves seven days' immersion in the chemical, one day's exposure to air, then seven days' immersion in seawater. Each method has its virtues and limitations, and whether any is a wholly adequate test for the specific chemicals involved in this case is open to dispute. But plaintiffs have failed to show that the methods were so inadequate as to be unreasonable during the 1970s, when the entire industry was still new. Plaintiffs concede that they have introduced "no test reports of other coating manufacturers" and even that the criteria "used [by other manufacturers] to determine suitability cannot be ascertained or evaluated." Pl. Post-Trial Reply Brief 37. Moreover, plaintiffs have suggested no testing methods other than those used by defendant. On this record, plaintiffs have simply not carried their burden of demonstrating that defendant failed to exercise reasonable care in using the testing methods it chose. If defendant's testing has not been shown to be a breach of duty because of faulty methodology, neither has it been shown to be inadequate because of a failure to conduct "such tests and inspections, during and after the process of manufacture, [as] are commensurate with the dangers involved in the intended use of the product." *Todd Shipyards Corp. v. Turbine Service, Inc., supra,* 467 F.Supp. at 1286.

Plaintiffs allege that defendant was negligent in representations it made on the basis of the test results and other information it had available. *See* pp. 1206–1210 *infra.* But plaintiffs have presented no persuasive evidence of tests that should have been run but were not. With respect to methanol, cumene, and benzene, plaintiffs have specified no particular failure of defendant to conduct tests. Only with respect to one chemical—vinyl acetate monomer, or VAM—do plaintiffs even suggest a

test that should have been run. *See* Pl. Reply Brief 25–26. Plaintiffs note that, although by mid-1971 defendant had conducted continuous and intermittent immersion tests, not until 1973 did defendant conduct sequencing tests on VAM. Plaintiffs merely ask why sequencing tests were not conducted earlier. They have shown no reason to suggest that defendant's doing so would have resulted in any differences in the PSLs. Indeed, the PSL listing of VAM as "suitability limited" remained the same even after the 1973 tests. Thus, plaintiffs have not demonstrated that defendant should have conducted any VAM test that it did not conduct.

B. *Adequacy of Suitability Representations*

Aside from the challenge to defendant's testing, plaintiffs assert that defendant was negligent, given the information it had available, in its representations concerning the suitability of carrying certain chemicals in tanks coated with its products. In particular, plaintiffs assert that the testing methods actually used should have led defendant to establish greater restrictions than were established for the carriage in A–64/66-coated tanks of vinyl acetate monomer (VAM), methanol, cumene, and benzene. Defendant's representations about D–4-lined tanks are not challenged. Analysis of the record shows that for none of the four chemicals have plaintiffs carried their burden of proving that defendant failed to exercise reasonable care in preparing information on their suitability for carriage in tanks lined with its coatings.

*VAM*

Neither Amercoat's January 1968 Technical Data Sheet for A–64/66 nor its October 1970 PSL for A–64/66, both of which were attached to plaintiffs' charter parties for the plaintiffs' two vessels, listed VAM as suitable, unsuitable, or of limited suitability. *See* PX 210 at 31–35. No testing of VAM took place in 1968. Tr. 553, 866–68 (Slot). Amercoat's A–64/66 "Tank Lining Chemical Resistance Chart," dated September 1969, listed VAM with a minus sign by

it, which meant either that VAM was not tested or that it was not suitable. PX 241; Tr. 867–88. Testing in late 1969 and 1970 led Amercoat to list VAM in its June 1971 PSL as "suitability limited." This designation meant that A–64/66-lined tanks carrying VAM must be "completely dry" and must "not neighbour with tanks carrying heated products," PX 11 at b, that VAM should be carried for no longer than one month, *id.* at c, and that "at least 24 hours" ventilation of such tanks should be allowed after transport, *id.* at b. *See* DX 65. VAM appeared again on the January 1973 PSL, with the same limitations. *Compare* PX 11 *with* PX 7.

Plaintiffs contend that these later representations of limited suitability were negligent because test results in 1969 through 1972 should have led Ameron to require Amercoat to designate VAM as unsuitable for carriage in A–64/66-lined tanks. *See* Pl. Post-Trial Brief 81–83. In a December 1969 test, they note, VAM fell off some test panels, PX 161, and in a 1971 test, VAM softened after 28 days and blistered after four months, PX 86. Plaintiffs assert that these tests showed that VAM was unsuitable.

Defendant's thorough analysis of the tests persuasively rebuts plaintiffs' summary conclusions. Unlike some of defendant's competitors, defendant made no representation of even limited suitability until after 1969, when it undertook testing. *See* DX 41, 42. The 1969 test includes reports dated May 9 and December 22. The May report, based on three months of testing, found performance satisfactory for most of the listed chemicals; no blistering was observed, and softening of the coating, a phenomenon widely known to vessel operators and owners and discussed in the suitability lists, *see* DX 42, 64; PX 7, 8, 9, 12, reflected no failure of performance. The December report, based on over ten months of testing, found that the coatings "fell off," as plaintiffs note. The test was conducted, however, at extraordinarily high temperatures, so that the test greatly accelerated the blistering process that would occur in actual use. *See* DX 61. Consequently, the De-

cember finding neither negated the positive results from May nor rendered unreasonable the recommendation of suitability of VAM for one month's carriage. *See id.;* Tr. 570.

Tests conducted between October 1970 and June 1972 used both the continuous and intermittent immersion methods. *See* DX 63; PX 86. Though blistering occurred in the intermittent immersion test, as plaintiffs point out, it occurred only after four months. This test, interpreted in conjunction with the positive results of the continuous immersion test, warranted a recommendation of suitability for one month's carriage. That one other manufacturer may have incorporated a safety factor of "five to eight," Tr. 268–69—*i.e.,* "eight months safe meant suitable for one month," Pl. Post-Trial Brief 82—does not show that defendant's safety margin was unreasonable, as there is no evidence that the five-to-eight factor was or should have been an industry standard.

The results of the tests begun in January 1973 similarly cast little doubt on the reasonableness of defendant's representations about VAM. DX 85. In response to plaintiffs' reports of blistering on the EXPLORER, defendant conducted sequencing tests, again under conditions more severe than those of recommended use, to determine if certain cargo combinations could explain the reported blistering. *Id.;* Tr. 703. The test results showed that, after one month's immersion in VAM, the A–64/66 lining had softened somewhat and had picked up traces of VAM, DX 85 (Report No. 1), findings that substantiated warnings given as early as 1972, *see* PX 7, 12. The tests likewise turned up no blistering after one month's exposure to VAM, followed by one month's exposure to various other chemicals often carried by tankers. DX 85 (Report No. 2). Even after six to eighteen months' testing, blistering or loss of coating adhesion appeared only for three cycles: VAM/Wash & Dry/VAM/50% sodium hydroxide (after 18 months); VAM/cumene (after 8 months); VAM/ethanol/seawater (after 3 months). *See* DX 85 (Final Report

at Tables I, IV, III). The tests thus demonstrated the vulnerability of A–64/66 to certain cargo sequences, a fact well known in the trade, Tr. 1003–06, and mentioned by Amercoat prior to the initial voyages of plaintiffs' vessels, DX 17 at 2; PX 229:RN at 104–07. The 1973 test results in no way undercut defendant's recommendation of VAM's limited suitability.

*Methanol*

Amercoat's June 1971 and January 1973 PSLs listed methanol as of limited suitability for carriage in A–64/66-lined tanks. PX 11 at 22, PX 7 at 28. In 1974, defendant changed this designation, listing methanol as unsuitable; this designation remains in effect. PX 8 at 29, PX 9 at 29; Tr. 842–43, 970. Plaintiffs contend that defendant was negligent in its recommendations of limited suitability. Plaintiffs point to very little evidence to support this contention. *See* Pl. Post-Trial Brief 83–84. They note that in 1970 one of defendant's employees, Mr. Richardson, informed Amercoat that methanol could be carried for one trip of not more than two months, *id.* at 83; *see* PX 87, but that the 1971 PSL approves carriage for three months, with 24 hours' ventilation following the trip. *Id.; see* PX 11 at 22; Tr. 819–21. They also assert that no manufacturer other than defendant permitted carriage of methanol in tanks lined with A–64/66 or an "equivalent" epoxy coating. Pl. Post-Trial Brief 83–84. Contrary to plaintiffs' suggestion, however, these contentions, when understood in their proper contexts, do not sustain plaintiffs' burden of proving that defendant's 1971–73 representations, though later modified, were negligent at the time they were made.

Richardson's telex to Amercoat in 1970 was not an instruction on future conduct. Rather, as Richardson testified, the telex was a reply to an inquiry based on the suitability list in effect at the time, namely, the January 1968 Technical Data Sheet, which designated methanol as of limited suitability, restricting carriage to two months. *See* DX 41. Richardson's telex was therefore not advice relevant to the reasonableness of the three month limit adopted by Amercoat in 1971.

The two month limit and other limitations contained in the 1968 list were retained in Amercoat's October 1970 list. DX 42. Tests were performed from March 1968 through September 1970, and no adverse effects of carrying methanol in A–64/66-lined tanks were found except some softening of the coating after continuous immersion for substantially longer than three months. The PSLs issued in 1971, 1972, and 1973, which approved carriage for three months, warned of the softening as well as of A–64/66's tendency to absorb some of the methanol being carried; the PSLs also imposed a more stringent ventilation requirement. PX 11, 12, 7. Defendant's test results, which are not alleged to be flawed, together with plaintiffs' failure to introduce any contrary test results, provide a sufficient basis for Amercoat's adoption of the three month restriction in 1971.

Defendant's designation of methanol in 1974 as unsuitable does not demonstrate the negligence of the earlier recommendation of limited suitability. The change in designation was made in response to plaintiffs' reports of problems in 1973. Plaintiffs have not demonstrated, moreover, that the practices of manufacturers other than defendant show the unreasonableness of defendant's PSLs prior to 1974. The 1968 product list for Colturiet Coating IV, which is comparable to A–64/66, is said by defendant to designate methanol as of suitability comparable to Amercoat's designation in 1968 and is said by plaintiffs to list methanol as unsuitable, *see* Def. Post-Trial Brief 99–100; Pl. Post-Trial Reply Brief 32, but the document submitted into evidence contains an alteration and is therefore itself unclear, DX 40 at m. The 1968 Mobil list for Sovapon epoxy, which is also comparable to A–64/66, does designate methanol as of at least limited suitability. DX 38 at 12. A 1970 Mobil list does not list methanol as suitable, PX 238, but it is doubtful, in part because a 1974 Mobil Sovapon list designates methanol as suitable, DX 44, that this list supercedes the 1968 European list as

well as a 1967 American list. *See* Pl. Post-Trial Reply Brief 31–32; Def. Post-Trial Brief 100 n. ***. A 1969 list for Jotun Tank guard epoxy, which, like the Mobil and Colturiet coatings, is comparable to A–64/66, designates methanol as of limited suitability. DX 39. The form of Sovapon epoxy for which the General Superintendence Company published a Commodity List in 1974 may not be comparable to A–64/66, *see* Pl. Post-Trial Reply Brief 32–35, so its compatibility with methanol may be irrelevant. But, along with Mobil's 1974 Sovapon list, DX 44, a 1975 list for Camrex TP121R epoxy, which is comparable to A–64/66, lists methanol as suitable, with restrictions comparable if not identical to Amercoat's restrictions in its 1971 and 1973 lists. DX 82 at 29. All of this evidence, in sum, has at best an indirect bearing on defendant's negligence concerning its 1971–73 recommendations about methanol, and what bearing it does have tends to favor defendant's position.

The reasonableness of defendant's 1971–73 designations gains further support from the tests it conducted between 1970 and 1973 to compare the methanol resistance of A–64/66 to that of certain other manufacturers' coatings. Those results show only a softening of A–64/66-lined panels after over nine months' immersion in methanol and a softening of panels after three months' immersion in methyl alcohol. DX 67, 69. These results, and the very fact of defendant's continued testing, undermine plaintiffs' contention that defendant failed to exercise reasonable care in designating methanol as of limited suitability from 1971 until 1974.

*Benzene and Cumene*

Plaintiffs' contentions that defendant negligently misrepresented the suitability of carrying benzene and cumene in A–64/66-lined tanks are similar. Cumene was designated as of limited suitability in the June 1971 and January 1973 PSLs, which restricted carriage of cumene to periods of under three months and required ventilation of the tanks for twenty-four hours after a trip. PX 11, 7. The 1974 suitability

lists designated cumene as not suitable. PX 8 at 9, PX 9 at 9. Benzene was listed as suitable on the June 1971 PSL, PX 11 at 4, and as of limited suitability on the January 1973 PSL, which required twenty-four hours post-carriage ventilation but did not restrict the duration of carriage, PX 7 at 4 & c. In 1974, defendant designated benzene as not suitable, PX 8 at 4, and later added "limitation 13," which meant that benzene had gotten poor test results, PX 9 at c–d, PX 10A, PX 16.

Plaintiffs contend that defendant's pre-1974 representations were negligent because defendant's test results showed cumene and benzene to be unsuitable for carriage in A–64/66-lined tanks as early as 1971. They assert that laboratory tests of cumene in May and June of 1971 revealed blistering after only two months, PX 86; Tr. 853–54; PX 184, and that 1971 laboratory tests of benzene showed poor results, PX 86. With respect to cumene, plaintiffs argue, defendant's negligence is shown by the fact that, according to the August 1974 criteria for products approval, cumene failed the 1971 tests and should have been listed as unsuitable at that time. With respect to benzene, plaintiffs argue, negligence is shown by the fact, evidenced by the "limitation 13" designation and by a telex from an Amercoat employee, that benzene's listing was changed in 1974 because of the poor test results and because of softening reported in actual use. Pl. Post-Trial Brief 84–85; *see* PX 9, 184.

Plaintiffs' arguments fail to establish that defendant's representations were negligent. Amercoat's January 1968 list showed cumene as suitable. DX 41. The October 1970 list simply omits mention of cumene. DX 42. Tests conducted in 1970 reported slight softening of A–64/66 after six months' continuous immersion, DX 68, and tests conducted in 1971 reported some blistering after three months' continuous immersion and two months' intermittent immersion, DX 63. Even standing alone, these results might not be sufficiently negative to render defendant's three month limitation in its 1971 and 1973 PSLs unrea-

sonable; plaintiffs do not point to any tests that should have been performed to reveal cumene's unsuitability. But because test conditions cannot reproduce the conditions of actual use, suitability recommendations can legitimately be based, as these were, on reports of user experience with the chemicals. Tr. 260–61, 541; *see* DX 38, 82. Whether or not any carriers of cumene after 1974 proceeded at their own risk, *see* Pl. Post-Trial Reply Brief 21–22, successful experience in carrying cumene in A–64/66-lined tanks is highly relevant to any judgment of cumene's suitability. Defendant's actual reliance on a significant and consistent body of reports of successful carriage is evident in the record and undisputed. That defendant did not, as they would not have been permitted to, scrutinize carrier practices in detail renders defendant's reliance on user reports no less reasonable. Defendant was entitled, in the absence of more negative test results than it had, to expect from all its customers the level of sophistication in carriage practices shown by the consistent user reports.

Defendant's recommendations regarding benzene were similarly reasonable. The 1968, 1970, and 1971 suitability lists designated benzene as suitable for carriage in A–64/66-lined tanks. DX 43, 42, 64. Contrary to plaintiffs' unexplained characterization, the only test results in evidence did not show a "poor" performance by benzene. The tests, conducted in 1970 and 1971, resulted only in moderate softening of the coating in the vapor phase using the continuous immersion method and in slight softening in the liquid phase after six months. DX 63. Such softening was not considered an indication of poor performance, and plaintiffs have not shown any reason why it should have been. That defendant added "limitation 13" in 1974, which, among other things, approves carriage for up to two months, does not show that defendant was negligent earlier. *See* PX 9. The document on which plaintiffs rely to support their characterization of "poor" performance makes clear that limitation 13 was added on the basis of "new test criteria" applied to those products subject to soften-

ing (not blistering or loss of adhesion) in the earlier continuous immersion tests. PX 16. Plaintiffs have advanced no evidence to show that defendant was negligent in not adopting the new test criteria earlier than 1974; on the record in this case, defendant appears to have been a responsible member of the industry in adopting ever more rigorous tests as reports from users indicated cause for concern.

In sum, plaintiffs' challenge to defendant's suitability designations fails. Plaintiffs have not shown that defendant was negligent in "failing to adequately test" the four chemicals or in "failing to be guided by test results." Nor have plaintiffs "misrepresented the capabilities of its products." Pl. Post-Trial Reply Brief 44.

### C. *Adequacy of Other Representations*

■ Plaintiffs claim generally, in their strict liability cause of action, that defendant breached a duty to warn of dangers from use of its coatings. They claim also, with more specificity, that defendant was negligent in "failing to adequately instruct and/or warn plaintiffs regarding . . . (a) improper cargo sequencing; (b) proper ventilation procedures; (c) method of determining recovery of the coating; (d) proper cleaning procedures; (e) the unsuitability of certain chemicals for carriage as first cargoes." *Id.* Defendant was under a duty to warn, however, only of those matters not within "the knowledge and expertise of those who may reasonably be expected to use or otherwise come in contact with" its coatings. *Martinez v. Dixie Carriers, Inc.,* 529 F.2d 457, 465–66 (5th Cir.1976). In this case, plaintiffs' sophistication as chemical carriers was such as to render defendant's warnings, which were extensive, adequate to fulfill any duty it may have had.

Shipowners such as plaintiffs to whom defendant sells its coatings are knowledgeable about the matters on which plaintiffs allege defendant gave inadequate warnings. They do not rely exclusively on coating manufacturers' representations, Tr. 267, 269, 988–90, 1003–06, 1032–33; they draw on their own testing, on their own experi-

ence and that of others, and on the guidelines issued by regulatory authorities; Tr. 1082; 46 C.F.R. § 153.1 *et seq.* (1981); PX 229:RN at 316. Shipowners and operators routinely have their own operating manuals for the care of epoxy and zinc-silicate coatings such as A–64/66 and D–4. Tr. 1019–20, 1032–35, 1038–39. Some have rules specifically addressed to ventilation, recovery, and cargo sequencing. *See* Tr. 1002–39, 1046–47. There is no evidence that such rules are unusual in the chemical carriage trade. Even plaintiffs' Captain Nunley revealed that important shippers' officers were familiar, as a matter of course, with the need and procedures for ventilation, proper cargo sequencing, and maintaining dryness at critical times. *See* Tr. 267, 269, 377–80, 391–92, 403–04. Moreover, plaintiffs declined Amercoat's offer of extra ventilation advice because it preferred to rely on its own expertise. DX 110:BY at 209–10. Shipowners and operators, in short, are well aware of the softening and absorption that ventilation, sequencing, and drying procedures are intended to halt, prevent, or cure.

Before plaintiffs selected products made by defendant for use on the CHEMICAL EXPLORER and the CHEMICAL VENTURER, they received product suitability lists and technical data sheets from defendant and Amercoat that contained numerous disclaimers and warnings that served as notice of the known dangers in chemical carriage. *See, e.g.,* PX 5, 6, 11. Plaintiffs cannot reasonably contend that they believed that, by following the bare outlines of the instructions in these lists and sheets, they would be guaranteed that the coatings would work to perfection. Plaintiffs were not novices in the business of transporting chemicals. They had previously constructed or converted several chemical carriers, *see* Def. Post-Trial Brief 7–8, and at least one of their vessels used Amercoat coatings, PX 229:RN at 27–29. Defendant reasonably assumed that plaintiffs, as experienced shipowners in the field, shared the general expertise regarding the need for special care in application, cure, and maintenance of defendant's coatings.

Ralph Nilssen testified at deposition that he received, read, and understood the product suitability lists and technical data sheets supplied by the defendant. PX 229:RN at 133–37. Plaintiffs' Exhibit 5 is a technical data sheet for Dimetcote 3 & 4 that was issued by Amercoat in August 1968. The document contains a long list of chemical products, each categorized for use in tanks coated with Dimetcote as being either definitely suitable, definitely unsuitable, or suitability limited. It also contains "remarks" for the products listed as "Suitability Limited" to indicate to users certain special factors that may affect the carriage of given chemicals. At the top of the list it is stated that the recommendations are based on shippers' reports and on tests made under laboratory conditions using the temperatures at which the products are usually transported. Users are warned: "Exposure at higher temperatures may in some cases be harmful to the coating." PX 5. At the bottom of the documents, there appears the following general notice:

> The above list of products is subject to change without notice. The results and recommendations contained in this list are based on user's reports and laboratory tests which are believed to be reliable. However, many commercial products of the type contained in this list are somewhat variable in composition, and their specifications are subject to change. Since we have no control over the products or the conditions of service, we expressly disclaim any responsibility for the results obtained from the use of Dimetcote or for any incidental or consequential effects of any kind.

*Id.* Plaintiffs' Exhibits 6 and 11 are, respectively, a technical data sheet for A–64/66, dated January 1968, and a product suitability list for both types of coatings, dated June 1971. Both are in the same format as plaintiffs' Exhibit 5 and contain essentially the same introductory material and concluding notice. In particular, they advise ventilation as the principal means for recovery of the coating, which can be tested by the touch of an experienced hand. PX 11; Tr. 999.

Plaintiffs received and read a sample Amercoat warranty from Swan Hunter while plaintiffs were in the process of firming up the details of the coating application. PX 229:RN at 100–05. This warranty, if it had been accepted by the parties, would have guaranteed that the average amount of blistering or rusting that penetrated the coating in its first three years would not exceed two percent of the entire coated area. DX 65 at 1. The coatings were "guaranteed to be suitable for the service for which they are recommended," but the guarantee was subject to a variety of conditions including a requirement that Amercoat approve the carriage of any chemical not included on the product suitability list, a requirement that no product categorized as "suitability limited" be carried for more than two consecutive months, and a requirement that, when this two month limitation was reached, at least one month elapse before another suitability-limited product is carried. *Id.* The warranty also required that certain cleaning procedures be used and that cleaning materials be limited to those approved by Amercoat. *Id.* The warranty limited Amercoat's potential liability to 100% of all qualified claims during the first year of service and 80% and 60% for the second and third years respectively. *Id.* at 3; *accord,* DX 17.

Plaintiffs argue that they are not bound by the terms of the warranty, which they claim was never executed by the parties. But for purposes of this litigation it is relevant that plaintiffs received and reviewed the document, so that they cannot claim ignorance of its early contents. Moreover, plaintiffs filed a claim under the warranty in early 1974. DX 110:BY at 172–80. Thus, even if plaintiffs were not contractually or otherwise obligated to follow the warranty's instructions regarding the consecutive carriage of certain chemicals or maintenance procedures, they were fully aware that material risks were involved in failing to comply with its terms.

Plaintiffs contend that they are now aware that it is harmful to carry restricted cargoes consecutively only because defendant's competitors prohibited such use on their product suitability documents. Pl. Post-Trial Brief 63. But plaintiffs examined the product suitability lists of other manufacturers before they selected the Amercoat coatings; they must therefore have been aware even then of the limitation on the use of certain products. Defendant's information, in the warranty and suitability literature, on cargo sequencing, ventilation, and recovery was adequate, given the knowledge defendant could legitimately presume plaintiffs to have. *See Martinez v. Dixie Carriers, Inc., supra,* 529 F.2d at 465–66; *Helene Curtis Industries, Inc. v. Pruitt,* 385 F.2d 841, 858 (5th Cir.1967), *cert. denied,* 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968). Plaintiffs have simply failed to show that defendant did not provide needed advice on subjects about which plaintiffs were ignorant. That conclusion applies as much to defendant's advice on cleaning sequences as it does to the advice on ventilation and other matters. It is doubtful that any single cleaning method is "proper," *compare* Tr. 372–73 *with* Tr. 1011–18, 1044, but in any event, plaintiffs' own ship captains knew that they should follow the cleaning method plaintiffs claim to be the proper one. *See* PX 220:BR at 161–62; PX 230:FB at 118–19; Tr. 245. On cleaning sequences, as on ventilation, cargo sequencing, and recovery, defendant breached no duty to warn.

Plaintiffs' allegation that defendant breached a duty to warn of restrictions on "first cargoes" refers only to its carriage of methanol. The chemical was listed on defendant's early product suitability lists as "suitability limited" for use in epoxy tanks and as definitely suitable for carriage in Dimetcote tanks. PX 5, 6, 11. Prior to the delivery of the CHEMICAL EXPLORER, however, plaintiffs knew that neither the epoxy nor the Dimetcote tanks were ready to accept methanol. DX 4, 20. Both parties were also aware that methanol is a particularly active substance, and plaintiffs have testified that a knowledgeable charterer "will know that he cannot carry that sensitive cargo right off. It is usual to carry a less sensitive cargo as a first initial

cargo, something which will help the aging process. . . . We rather faulted the charterer for not warning us in advance of their intention to carry methanol as first cargo so we could have made this go more smoothly and be ready for this cargo." PX 229:RN at 279–80, 287–88.

Plaintiffs claim that they were damaged because Eurochem put the CHEMICAL EXPLORER off-hire once it determined, after conducting tests in Rotterdam, that it would not be able to transport methanol. They assert, among other things, that the defendant was negligent in failing to warn plaintiffs that it was necessary to wash down the Dimetcote coatings vigorously in order for the tanks to be ready to carry a sensitive cargo such as methanol. Plaintiffs are correct that the defendant could have been more informative, but they have failed to show that defendant failed to perform any act it was under an affirmative duty to undertake. Defendant provided plaintiffs with a considerable volume of information concerning proper cure and maintenance of the tanks, and specifically warned them that the tanks were not capable of carrying methanol.

Further, defendant had no reason to anticipate that an especially sensitive product was to be carried on the ship's first voyage. Plaintiffs and Eurochem were knowledgeable parties: they knew or should have known of the potential for problems if such a cargo was carried at an early date. Had they warned defendant of their intention, defendant might have been placed under an affirmative obligation to ensure either that the ships were ready for this use or that plaintiffs and Eurochem were specifically notified of the kind of damage that might occur if methanol was carried in tanks that were not fully cured. In fact, defendant received notice of the parties' intentions to carry methanol when work was in progress on the coatings of the CHEMICAL VENTURER; it then revised its recommendations to warn plaintiffs explicitly that methanol and similar cargoes should not be carried for the first two months so that the coatings could reach the state of final cure. DX 102.

After the CHEMICAL EXPLORER arrived in Corpus Christi, Texas, in late May 1972, a sample of methanol was loaded into three of the vessel's epoxy tanks to determine whether they were ready to carry that chemical. The methanol was then diluted with water, apparently because it was thought that this would lessen the damage that was being caused by the methanol. See PX 159. Plaintiffs concede that the introduction of methanol and methanol diluted with water softened and damaged the coatings on the tested tanks. They once again contend, however, that it was defendant's failure to warn them of the possible effects of this procedure that caused them to take the actions that resulted in damage. Pl. Post-Trial Brief 38. But plaintiffs already knew that the tanks were not sufficiently cured to carry methanol, see Tr. 673–74, and they were never given any indication by defendant that it was proper to test the tanks in this way. Furthermore, plaintiffs and Eurochem knew or should have known that methanol is not the same chemical as methanol diluted with water, and that the latter was not listed on any of defendant's product suitability lists.

In summary, plaintiffs have not shown that defendant breached any duty to warn of dangers from use of its coatings. Plaintiffs have shown no misrepresentations and no negligent failure to warn. Moreover, they have not demonstrated by a preponderance of the evidence that there was any matter on which plaintiffs were, or should have been assumed to be, so ignorant that defendant's warnings were inadequate. With the information plaintiffs had available, from defendant and from other sources (including their own experience), they could and should have properly used the coatings, thereby avoiding harm. Defendant's product was, in short, reasonably fit for its intended and foreseeable uses. Finally, plaintiffs have not proven that any of defendant's representations were misrepresentations, because plaintiffs were fully aware of the provisional nature of all the challenged representations, and any reliance by plaintiffs was unjustified.

## V. *Causation*

■ Even if defendant violated some duty owed to plaintiffs, the plaintiffs have failed to prove by a preponderance of the evidence that any damage they sustained was the proximate result of the defendant's conduct. First, plaintiffs have not proven that they relied on the claims they assert to be misrepresentations. Second, evidence of improper application of the chemical coatings, inadequate curing following application, carriage of unauthorized chemicals, misuse of the tanks in carrying "suitability limited" chemicals, and improper tank cleaning and maintenance together make it far more likely than not that responsibility for the damage to the tanks lies with plaintiffs rather than with defendant. In particular, plaintiffs' misuses were not within the intended or foreseeable uses of defendant's coatings, and hence any unfitness for such uses of the coatings that there may have been has not been shown to have caused plaintiffs' damages. Consequently, plaintiffs have not proven the causation that is required for liability under any of its theories.

Little evidence supports plaintiffs' contention that the choice of Amercoat products was made as the result of the marketing efforts of Ameron sales representatives, or that they relied on certain advertisements that appeared to suggest that Amercoat products would last for ten years. *See* Pl. Post-Trial Brief 9–11. Ralph A. Nilssen, the Anglo Nordic official responsible for selecting the coatings on the two new vessels, testified at deposition that Amercoat had the best reputation in the business and that Anglo Nordic had had good experiences with Amercoat coatings on another ship. PX 229:RN at 39–41. Nilssen testified that he and Anglo Nordic's Vice President Thor Karlsen "sat down and examined [proposals from various manufacturers] in detail and decided that Amercoat was the most eligible, even though the cost was considerably higher than others. One factor was that they would provide the best guarantee; also the factor that they were well known to the charterer." *Id.* at 187. Karlsen testified at trial that, although the

final decision about which coating was to be used rested with Anglo Nordic, the decision was made primarily by Eurochem. Tr. 128–29. Representatives of Ameron paid at least two sales visits to plaintiffs, PX 1, 2, and Karlsen claimed to have seen Ameron advertisements in an American Legion dinner dance program, Tr. 109–10. But plaintiffs failed to prove that they relied on any of the information provided by the sales representatives or in the advertisements in selecting Amercoat products. Moreover, plaintiffs failed to show that any of this information received before selecting Amercoat caused them in any way to change their position in regard to the use of the products.

The relationship between plaintiffs and their charterer, Eurochem, was a significant cause of many of the difficulties that arose in connection with the two vessels. The charter parties between Anglo Nordic and Eurochem gave the latter what even plaintiffs have described as an unusual degree of control over the type of cargoes that it was permitted to carry. PX 233:RN at 165–67; PX 110:BY at 213–16. Eurochem was entitled to transport all products that appeared on the defendant's product suitability lists, and it had no responsibility for the condition of the tanks so long as they adhered to any "suitability limitations." DX 17. The owners retained the responsibility for ensuring that the tanks were clean and suitable to carry chemicals. Tr. 116. And the owners were obligated to repair any coating damage other than that caused by the charterer carrying unauthorized cargoes. PX 210, 211 (clause 73, ¶ 2). The charterers were not obligated to pay plaintiffs for any time that the vessels were off-hire. Tr. 116. Therefore, Eurochem had no economic incentive to take care to ensure that the tanks remained in good condition, and Anglo Nordic had no power to prevent Eurochem from straining the limits of the coatings.

The process of constructing the tanks and applying and curing the chemical coatings was beset with problems. The coatings were applied by Metnor under the supervi-

sion of Swan Hunter. PX 229:RN at 24–26. Plaintiffs had final authority to approve or disapprove application and cure. DX 25 (¶ 3). Anglo Nordic had its own employees present at the construction site during the period of application and cure. They were responsible for inspecting all application work, and they were expected to report all problems and difficulties to their employer. PX 229:RN 55–59. Defendant provided the plaintiffs with detailed application instructions and specifications for both Dimetcote and Amercoat 64/66 coatings, including curing times at varying temperatures. DX 36, 37. An employee of Amercoat was also present at the construction site. Apparently, his role was to ensure that the work met Amercoat specifications for purposes of issuing its warranty. There is no evidence that the Amercoat employee had any authority to reject work or to order additional work to be done by Metnor or Swan Hunter.

A series of communications between representatives of Anglo Nordic and Swan Hunter concerning both vessels reveals that problems in connection with application and cure became so severe that Anglo Nordic repeatedly threatened to withhold approval of the shipbuilder's construction work. In November 1971, six months before the CHEMICAL EXPLORER was delivered to Eurochem, Anglo Nordic complained of faulty tank preparation and noted that "the work was not up to our standard" and then reminded Swan Hunter that "100% owner's approval is necessary and if the work presented for inspection is the same as in [specified tanks] it will be unacceptable." DX 6. Anglo Nordic warned Swan Hunter that it would be responsible for "any delays incurred in re-coating and future coating breakdown[s]." DX 7.

Anglo Nordic specifically complained of Swan Hunter's lack of proper equipment for coating application and cure. Anglo Nordic noted that there was inadequate staging equipment, improper ventilation, lack of dehumidification and heating equipment. DX 1, 9, 10. They also commented and complained, either in internal memoranda or in communications to Swan Hunt-

er, about Metnor's poor organization and insufficient labor force, DX 6, about unclean tanks and unusual chemical reactions, DX 10, 11, 12, 13, 16, and about Swan Hunter's failure to protect the tanks from the effects of a particularly harsh English winter, Tr. 309–10, 624, 880.

Plaintiffs take the position that defendant should be estopped from asserting that the coatings were improperly applied or cured. Their argument is based on telexes sent from Amercoat Europa to Anglo Nordic on May 5, 1972, and September 4, 1972, regarding the CHEMICAL EXPLORER and CHEMICAL VENTURER, respectively. The telex concerning the CHEMICAL EXPLORER stated that the coatings had been *applied* in accordance with Amercoat specifications and instructions and under the auspices of Amercoat's resident application technician, Alf Cook. PX 97 at 2. The September 4 telex concerning the CHEMICAL VENTURER made the same representations about both the *application* and *curing* of the tank coatings. *Id.* at 1.

■ In order to create an equitable estoppel, the moving party must be able to prove, among other things, that it relied to its detriment on a misrepresentation by the other party. *Special Event Entertainment v. Rockefeller Center, Inc.,* 458 F.Supp. 72, 76 (S.D.N.Y.1978). Plaintiffs argue that defendant knew that the coatings had not been applied in accordance with these specifications and that they relied on defendant's telex statements to the contrary.

■ Defendant's telexes must be read in the context of all the communications between Amercoat and Anglo Nordic during the period of application and cure. Plaintiffs were fully aware of the application problems on both vessels; as previously noted, they had complained on numerous occasions about construction conditions and practices to Swan Hunter. Plaintiffs' contention that they relied on defendant's May 5 telex that the application of the coating to the CHEMICAL EXPLORER was proper is unreasonable in light of the fact that plaintiffs apparently requested that defend-

ant send the telex in order to placate Eurochem. Even more untenable is plaintiffs' suggestion that the May 5 communication should bar defendant from asserting that the *curing* on the CHEMICAL EXPLORER was inadequate. Plaintiffs had received a telex from defendant only one day earlier that unambiguously stated that neither the Dimetcote nor the A–64/66 tanks on the CHEMICAL EXPLORER had been fully cured. Defendant's statements regarding the application and cure of the coatings is evidence that they believed, at the time of the communication, that the problems with the application process on the CHEMICAL EXPLORER and the application and cure problems on the CHEMICAL VENTURER had been remedied. This stated belief, however, is not proof that the application and curing was in fact adequate. The subsequent history of the tanks demonstrates that improper application and curing did have a detrimental effect on the coatings.

■ Finally, defendant cannot be estopped from challenging the efficacy of the application or coating process merely because one of its employees was present at the construction site and participated in the application and curing process. Alf Cook was present to help ensure that the processes met Amercoat standards for warranty purposes; he had no power to compel plaintiffs or Metnor or Swan Hunter to take any steps to remedy any perceived problems, except that he could advise his employer to withhold approval of the work for warranty purposes. The coatings were applied by Metnor under a subcontract agreement with Swan Hunter, which had a contract with Anglo Nordic. Defendant may be held liable only if it can be shown that its negligence somehow caused damage to the chemical tanks. Plaintiffs have not made this showing. Rather, the evidence demonstrates that the damage was caused by plaintiffs' own actions and by the absence of proper equipment for applying and curing the tank coatings.

The deficiencies in equipment and procedures that alarmed plaintiffs early in the construction process in some cases resulted in precisely the kind of coating failures that could be expected under such circumstances. For example, one of the areas of concern to plaintiffs involved Swan Hunter's lack of dehumidification and heating equipment. Tr. 883–85; DX 1. Plaintiffs must have been concerned that this lack of equipment could cause the tanks to rust. *See* DX 2. Plaintiffs knew that when epoxy coatings are applied to rusty surfaces, the coatings are likely to deteriorate, PX 228:WG at 117–19; PX 229:RN 139–40, and they warned Swan Hunter that it would be responsible for any coating breakdown, DX 7. That certain epoxy tanks on the CHEMICAL EXPLORER showed rust spots when tested prior to their delivery to Eurochem, and others later showed rust problems, DX 50 at 2; Tr. 891–95, is, absent a contrary explanation, proof of inadequacies in the application and curing processes.

The evidence further shows that, although many of the problems with the application and cure process were eventually remedied, some of the efforts of plaintiffs and Swan Hunter to remedy the defects caused additional damage. In late April 1972, only a few days before the date that the CHEMICAL EXPLORER was to be delivered to Eurochem, five of the epoxy tanks were filled with seawater to determine whether there were rust problems or uncoated areas. The test revealed substantial rusting on all of the tested tanks. *See* Tr. 893–95. Plaintiffs subsequently ordered "touch-up" repairs to the rusted areas and then authorized heating coils to be introduced into the tanks to provide a "steam treatment" to at least three of the tanks. Defendant credibly claims that it did not authorize either the seawater tests or the subsequent steam treatment. *See* Tr. 896–97. They claim, and plaintiffs' expert agrees, that the introduction of heating coils to steam tanks that are uncured or partially cured will cause damage to any uncured or partially cured portion of tank coating. Tr. 382.

The plaintiffs properly note that only the portions that were not fully cured, not the entire tanks, were damaged by this proce-

dure. The evidence is inconclusive as to which portions of the tanks meet this description. Plaintiffs cannot, however, rely on the telexes sent by defendant or any similar evidence to assert that the tanks were fully cured so that any unauthorized or improper treatment of the tanks caused no additional damage. Indeed, as noted above, the telexes concerning the CHEMICAL EXPLORER gave no assurance whatsoever of proper curing.

Improper application and curing were not the sole causes of damage. Many of the problems must, on this record, be found to have been caused by Eurochem's carrying of methanol on early voyages. PX 229:RN at 279–80; see Tr. 119. As noted above, carrying methanol at the time and in the way plaintiffs did was a clear misuse of the coatings, one for which defendant is not responsible.

An examination of the actual utilization of the storage tanks aboard the CHEMICAL EXPLORER and the CHEMICAL VENTURER reveals much about the cause of the coating failures. Defendant has provided a summary of the ship's logbooks concerning eight of the nine epoxy tanks on the CHEMICAL EXPLORER and seven of the nine on the CHEMICAL VENTURER. Defendant correctly notes that the sheer volume of entries concerning the use of each tank during the eight years of operation makes a full study of every tank impossible. Defendant offers its summary as "illustrations of operations on plaintiffs' vessels." Def. Post-Trial Brief 43 n. *. Plaintiffs have had a full opportunity to provide their own information about the studied and the non-studied tanks and to

rebut the information supplied by defendant. They have failed to do either.

Defendant contends that unauthorized materials were carried in the tanks on a number of occasions. The summary of the logbooks of the CHEMICAL EXPLORER shows that ethyl ketone, which was listed as unsuitable for Amercoat-64/66 coatings on the June 1971 product suitability list, was carried in Tank 2CS. DX 81 at 5. Plaintiffs concede this, stating in their brief that "there is no explanation for this—it should not have been done." Pl. Post-Trial Brief 71. Moreover, methyl carbinol, which is not listed on any of the product suitability lists, was carried in Tanks 3C, 9WS, and 10C in late 1973. Plaintiffs suggest that this is the chemical equivalent of ethyl alcohol, which is listed as suitable for carriage in epoxy tanks, Pl. Post-Trial Brief 76, but failed to introduce any evidence to support this position. Defendants also note that methanol diluted with water was carried in Tank 4C in September 1972, well after plaintiffs concededly became aware that such a mixture could damage epoxy coatings. This solution apparently was pumped from Tank 4C to 10C, damaging both tanks in the process. DX 81 at 10.

Defendant has, in addition, compiled an impressive record of other misuses of the storage tanks.[3] In particular, the summary of the logbooks shows that plaintiffs repeatedly carried "suitability limited" cargoes for more than two months, in violation of the terms of the warranty received by plaintiffs and contrary to commonsense operation of the vessels. The warranty clause, as previously noted, reads:

**3.** Defendant contends that plaintiffs improperly carried ammonium nitrate in all seven of the epoxy tanks on the CHEMICAL EXPLORER. Plaintiffs contend that the material that was actually carried was urea ammonium nitrate, which was listed on the June 1971 products suitability lists as suitable to a maximum of .1% free ammonia. PX 11 at 38. Plaintiffs have suggested that this apparent misuse was probably the result of a careless logbook entry, and that urea ammonium nitrate was probably the chemical that was actually carried. This position has support: ammonium nitrate is usually a solid, so it would not likely be the

subject of carriage in tanks such as those on the CHEMICAL EXPLORER; more important, plaintiffs requested and received permission from defendant to carry urea ammonium nitrate with a maximum 2% free ammonia for one trip just a few weeks before the allegedly improper carriage of ammonium nitrate. PX 243. Defendant's suggestion that the latex that was carried in Tank 3C in late 1972 was one of the three (of eight) types listed as being of limited suitability is unpersuasive in light of defendant's failure to produce any evidence to support this contention.

No products classified as "Suitability limited" in the "Product List for tanks lined with Amercoat 64/66" can be transported in tanks lined with Amercoat 64/66 for consecutive periods in excess of 2 months. When this limitation has been reached, there must be a lapse of one month before products classified as "Suitability limited" in the Amercoat 64/66 Product List can be carried again.

DX 65. The plaintiffs violated this provision on all eight tanks that were studied on the CHEMICAL EXPLORER and on five of the seven on the CHEMICAL VENTURER. To cite the most extreme example, Tank 10C on the CHEMICAL EXPLORER carried suitability limited chemicals eleven consecutive months. Tr. 676–77.

Defendant points out that the severe conditions to which plaintiffs exposed the tank coatings were especially detrimental in light of the inadequate job of application and cure that occurred in the first place. In the words of defendant's expert Cornelis Slot, "with so many limited and restricted cargoes one after the other, where you really ask for super-duper performance, you also better start with super-duper application . . . ." Tr. 671.

The defendant also proved that plaintiffs' care and maintenance of the storage tanks often fell far below scientifically and commercially acceptable standards. For example, the relevant product suitability lists specifically required that the tanks be ventilated for at least twenty-four hours after certain chemicals were discharged, including cumene, styrene, VAM, and toluene. PX 7, 12. The logbooks reveal that ballasting or butterworthing, a process by which tanks are cleaned by the introduction of high pressure water against tank walls, Tr. 1017, often occurred within twenty-four hours of cargo discharge. Plaintiffs raise several defenses to this assertion. Viewing the evidence in its entirety, however, it is clear that plaintiffs' conduct constituted improper maintenance, and that it was a significant cause of damage to the tanks.

Plaintiffs concede that some of the product suitability lists required that tanks be ventilated after the carriage of certain chemicals. But they argue that the lists did not require that such ventilation be performed prior to the cleaning of the tanks through ballasting or butterworthing. There is no evidence, however, that plaintiff *ever* ventilated some of the tanks in question and they admit in their brief that "there is no explanation" for the ballasting of the chemical Tank 2CP in February 1973, immediately after the carriage of vinyl acetate monomer. Finally, the extreme use to which the two vessels were put made proper maintenance nearly impossible. The ship's managing agent, Brian Yates, testified that the continuous running of the ship left no time in port to perform even the most routine of work. DX 110:BY at 39.

In sum, plaintiffs allege, and have provided evidence, that there was damage to almost all of the tanks coated with A–64/66, on both the CHEMICAL VENTURER and the CHEMICAL EXPLORER, as well as to some of the Dimetcote-coated tanks. They have failed, however, to prove that any such damage was proximately caused by any breach of duty on the part of defendant. Rather, defendant has presented overwhelming evidence that the coating failures were caused by the misconduct of plaintiffs and the charterer. For the tanks specifically studied by defendant, as discussed above, there is substantial evidence of specific instances of misuse through the carriage of unauthorized cargoes, improper maintenance, and overuse. Plaintiffs' response to these allegations, as set forth in their post-trial memoranda, is generally either that any improper conduct on their part was done pursuant to negligent instructions or omissions by the defendant concerning the use and maintenance of the coating products, or that the tanks had already been damaged as a result of defendant's negligence, so that any additional misconduct by plaintiffs had no effect on the tanks' condition. But plaintiffs have failed to prove that defendant negligently tested the coatings or negligently provided misinformation concerning their proper use. Plaintiffs have likewise failed to prove that their

damages were caused by any defect in the coatings when sold rather than by their own misuse of the coatings.

As for the tanks that were not specifically discussed by the defendant, plaintiffs have likewise failed to prove damage as a result of defendant's alleged breach of duty. The evidence about instances of misconduct concerning the tanks specifically studied strongly suggests that similar abuses occurred on all of the tanks, a suggestion that plaintiffs were obliged to negate. And the general assertion that the continuous operation of the vessels made normal care and maintenance impossible clearly applies to all of the tanks on both vessels.

On the basis of the foregoing findings and conclusions, plaintiffs' claims are all dismissed, and final judgment shall be entered forthwith in defendant's favor, with costs.

SO ORDERED.